## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

DANNY HALL,

                Plaintiff,

-vs-                                     Case No.  2:05-cv-559-FtM-29SPC

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court on the Plaintiff Danny L. Hall's Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on November 23, 2005.  The Plaintiff filed her Memorandum of Law in Support of the Complaint (Doc. #12) on May 11, 2006.   The Commissioner filed her Memorandum of Law in Support of the Commissioner's Decision (Doc. #15) on June 26, 2006.  Thus, the Motion is now ripe for review.

        The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

## FACTS

### _Procedural History_

_____The Plaintiff filed an application for Social Security Disability Insurance (SSDI) benefits on January 15, 2002.  (Tr. 93-95).  The Plaintiff alleged an onset disability date of January 7, 2002 due

to diabetes, atrial fibrillation, sleep apnea, reflux and anxiety. (Tr. 35). The Plaintiff's claim was denied initially and upon reconsideration. (Tr. 35). The Plaintiff timely filed a Request for Hearing. (Tr. 63). A hearing was held before Administrative law Judge (ALJ) Melvin A. Padilla on January 22, 2004, in Dayton, Ohio. (Tr. 522-551). The ALJ issued an unfavorable decision on August 25, 2004. (Tr. 32-49). The Plaintiff filed a Motion for Reconsideration by the Appeals Council. (Tr. 57-59). On December 8, 2004, the Appeals Council reversed the decision and remanded the case back to the Commissioner because medical records from another claimant were inadvertently included in the file and that material findings in support of the decision had been based on those records. (Tr. 50-52). Pursuant to the Appeals Council's remand Order, a new hearing was held on May 11, 2005, in Dayton, Ohio before the ALJ Padilla. (Tr. 493-521). The Plaintiff's wife, daughter and a vocational expert offered testimony. (Tr. 14, 493-521). The Plaintiff signed a Waiver of Representation on the date of the hearing and proceeded with the hearing without representation of Counsel. (Tr. 88). On June 20, 2005, the ALJ issued an unfavorable decision finding that the Plaintiff was not disabled because he was capable of performing other work. (Tr. 11-29). On October 3, 2005, the Appeals Council declined to review the decision making the ALJ's decision the final decision of the Commissioner. (Tr. 6-8). Pursuant to 42 U.S.C. § 405(g), the Plaintiff now seeks judicial review of the Commissioner's final decision.

### *Plaintiff's History*

The Plaintiff was born on July 23, 1946, and was fifty-six (56) years old on the date his disability insured status lapsed. (Tr. 16). The Plaintiff has a high school education. (Tr. 16). The Plaintiff has a past relevant work history as a school bus driver and as a tractor trailer truck driver. (Tr. 16). The Plaintiff has an onset disability date of January 7, 2002. (Tr. 16). However, the

Plaintiff's date last insured is December 31, 2002, therefore, the Plaintiff must establish disability prior to that date, regardless of whether his condition has worsened since then. (Tr. 16).

*Medical and Psychological History*

Medical records reveal that the Plaintiff since at least 1997, has been a patient at the United States Air Force and Veteran's Administration Medical Centers. The records from these facilities indicate that the Plaintiff has diabetes mellitus, hypertension, history of obstructive sleep apnea associated with hypoxia and polycythemia. (Tr. 190). The Plaintiff was prescribed a C-PAP machine for the sleep apnea but did not use it due to lack of equipment parts. (Tr. 268). Records dating from January 1997 indicate that the Plaintiff was engaged in heavy alcohol use. (Tr. 190, 231).

On January 16, 1997, the Plaintiff presented to the Wright Patterson Air Force Base (WPAFB) medical facilities complaining of light headedness and headache. (Tr. 190). The Plaintiff also reported a slight decrease in vision without diplopia or blurring and numbness in his feet. (Tr. 190). Capt. Michael F. Trexler, a physician with the US Air Force, noted that the Plaintiff's prescriptions ran out two (2) months prior and he had not taken his oral hypoglycemics, antihypertensives nor checked his blood sugar since then. (Tr. 190). The Plaintiff's pulse was 168 and he was referred to the emergency room to rule out structural abnormality. (Tr. 190). Testing revealed mild left ventricular enlargement with moderate global left ventricular dysfunction and diastolic dysfunction. (Tr. 191).

On January 21, 1997, the Plaintiff presented to the Grant/Riverside Methodist Hospital with a chief complaint of chest pain. (Tr. 231). The Plaintiff was alert and oriented times 3, cooperative and in no acute distress. (Tr. 231). The Plaintiff admitted to telemetry with Coumadin, Rythmol and an echocardiogram was ordered. (Tr. 231). Testing revealed mild left ventricular hypertrophy but

otherwise normal with no definite evidence of recent infarction but paroxysms of probable atrial flutter. (Tr. 237). The Plaintiff was diagnosed with atrial fibrillation. (Tr. 231).

On May 23, 2000, the Plaintiff reported a work injury described as a fall with chest wall contusion. (Tr. 242). The Plaintiff had no respiratory distress. (Tr. 243). The Plaintiff's chest wall had deep tenderness on the 5th and 6th rib anteriorly. (Tr. 243). On May 31, 2000, the Plaintiff stated that the bruises were gone but still reported pain. (Tr. 243). Upon examination, ecchmyosis and bruises were resolved and breath sounds were symmetrical. (Tr. 243).

On July 28, 2000, the Plaintiff presented to Dr. Valerie Woodmansee of The Community Hospital, with a chief complaint of irregular heartbeat and dizziness. (Tr. 249). The Plaintiff's blood pressure was 134/77. (Tr. 16). An electrocardiogram (EKG) showed normal sinus rythum and left axis deviation. (Tr. 250). The Plaintiff was diagnosed with atrial fibrillation and was restarted on medication. (Tr. 17, 250, 253).

On January 8, 2001, the Plaintiff was evaluated by Ms. Arnott, a staff psychologist at the WPAFB medical center. The Plaintiff was diagnosed with chronic post traumatic stress disorder with mixed features and was given a Global Assessment of Functioning (GAF) score of 50, consistent with serious limitations bordering on moderate difficulty. (Diagnostic and Statistical Manual of mental Disorders, Fourth Edition, Washington D.C., American Psychiatric Association, 1994, page 32). (Tr. 17, 303-307). The Plaintiff reported a past history of alcohol abuse but has not taken a drink in three (3) years. (Tr. 305).

On March 13, 2001, the Plaintiff was evaluated by Dr. Judith Sigmund, a staff psychiatrist. The Plaintiff was taking Temazepam 30 mg and sometimes alternates it with Ambien 10mg. (Tr. 302). The Plaintiff reported feeling brighter and "pretty good during the day". (Tr. 302). Upon

mental status examination, the Plaintiff had good hygiene and good eye contact. (Tr. 302). His affect was full and his mood was euthymic. (Tr. 302). The Plaintiff's thought process was linear and logical with not homicidal or suicidal ideation, no psychosis and cognition was grossly intact. (Tr. 302). The Plaintiff received a GAF rating of 60 consistent with moderate limitations bordering on mild per DSM-IV, supra. (Tr. 17, 302). The Plaintiff was seen on July 31, 2001, by Dr. Charles Walters, and received the same mental status examination results and a GAF of 60. (Tr. 291).

On April 11, 2001, the Plaintiff presented to Dr. David Powell for a hemotology consultation report. (Tr. 258-259). The Plaintiff denied smoking or drinking. (Tr. 17). He was in no acute distress. (Tr. 17). An electrocardiogram showed normal sinus rhythum and an echocardiogram was normal. (Tr. 17). Chest x-rays were normal except for minimal cardiomegaly. (Tr. 17). Testing revealed that the Plaintiff has had normal red cell mass and normal B12 levels. (Tr. 259). The Plaintiff experienced a drop in hemacrit, therefore, given the Plaintiff's age, a colonoscopy and fecal occult blood tests x 3 were ordered. (Tr. 259). The Plaintiff was diagnosed with polycythemia and chronic elevated liver function. (Tr. 17).

On June 12, 2001, the Plaintiff underwent a colonoscopy with  Dr. Alexander Low, Maj. USAF. (Tr. 257). Testing revealed a benign appearing diminutive polyp without evidence of colonic source and chronic blood loss. (Tr. 257). The Plaintiff was to be scheduled for a EGD to determine whether there is an upper source of bleeding. (Tr. 257).

On December 23, 2001, Dr. Peter K. Derussey, Major, USAF, a general internist, indicated that the Plaintiff had a history of crystal-proved gout as well as a possible non-alcoholic steatohepatitis. (Tr. 17, 268). The Plaintiff also had a history of diabetes mellitus, likely aggravated

by his poor compliance in taking medication and following a diabetic diet and associated with erratic control of blood sugar levels. (Tr. 17).

On January 22, 2002, the Plaintiff presented to Dr. Sigmud for a follow-up for treatment for PTSD. (Tr. 274-275). The Plaintiff complained that the medications were not working and he discontinued using them. (Tr. 274). The Plaintiff advised he was laid off at that time. (Tr. 274). Upon mental examination, the Plaintiff was alert and oriented to person, time, and situation. (Tr. 274). He was dysphoric. (Tr. 274). There were no signs of psychosis and no homicidal or suicidal ideation. (Tr. 274). The Plaintiff's medications were altered and he was given a GAF score of 50, consistent with a high end of serious severity (a score of "51" would reflect moderate severity). (Tr. 17, 274).

On February 22, 2002, Dr. Vickie McCreary, a reviewing psychological consultant for the Bureau of Disability Determination Services (BDD) completed a Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment. (Tr. 349-351). She concluded that the Plaintiff had mild limitations of daily living and social functioning, and moderate restrictions of ability to maintain concentration, persistence or pace. (Tr. 17, 274-275). Dr. McCreary further found that the Plaintiff had no documented episodes of mental decompensation of extended duration. (Tr. 17). Dr. McCreary opined that regarding his mental residual functional capacity, he was moderately restricted in areas relating to maintaining a work schedule, concentrating, and adapting to work changes. (Tr. 17, 346). The Plaintiff was found to be capable of performing simple tasks and making decisions. (Tr. 17, 350-351). The Plaintiff was able to carry out some household chores, shop, and visit at a club. (Tr. 17, 351). Dr. McCreary opined that the Plaintiff had few limitations in his activities due to his alleged mental problems. (Tr. 17, 351). On July 24, 2002, Dr. Joan Williams,

another reviewing psychological consultant of the BDD, affirmed the opinion of Dr. McCreary. (Tr. 336-351).

On March 12, 2002, the Plaintiff presented to WPAFB Medical Center for a physical examination for the Department of Transportation. (Tr. 18). The next day the Plaintiff presented to the Dayton Heart Hospital and was found to be in atrial fibrillation. (Tr. 18, 368-379). The Plaintiff's medications were again altered. (Tr. 368). Dr. Daniel M. Moshos, D.O., completed a Medical Examination Report for Commercial Driver Fitness Determination[1] on March 12, 2002. Dr. Moshos opined that the Plaintiff did not meet the standards due to uncontrolled HTN arthythmia. (Tr. 455).

On March 20, 2002, Dr. Charles Derrow, a reviewing medical consultant of the BDD, completed an analysis of the Plaintiff's physical impairments. (Tr. 379). Dr. Derrow opined that there was no documentation of chronic, persistent functionally "severe" medically determinable physical impairment. (Tr. 379). Dr. Derrow stated that there was no diabetic end organ damage, no heart failure, no rhythm induced neurophysiologic or cardiac findings. (Tr. 379). Further, there was no evidence of gastroesphogeal reflux, and no evidence of significant joint pathology. (Tr. 379).

On July 25, 2002, Cindi Lynn Hill, M.D., a reviewing medical consultant of the BDD, prepared an analysis. (Tr. 421). Dr. Hill opined that the Plaintiff's recent episode of atrial fibrillation could be expected to resolve with appropriate treatment. (Tr. 18, 421). Dr. Hill affirmed the previous assessment by Dr. Derrow. (Tr. 18, 421).

---

[1]This report was submitted subsequent to the Plaintiff's first hearing. (Tr. 19).

The remaining evidence refers to a period subsequent to the Plaintiff's date last insured.  In August 2003, the Plaintiff was experiencing additional stress due to his wife's illness and his daughter's legal problems.  (Tr. 18).

On December 15, 2003, Dr. Anthony Ochoa, Capt. USAF, evaluated the Plaintiff for a routine cardiologic follow-up. (Tr. 424).  Dr. Ochoa opined that the Plaintiff's current medical condition (Nonischemic Cardiomyopathy complicated by Atrial Fibrillation) was stable, however, he has moderate to severe heart dysfunction limiting his functional capacity.  (Tr. 424).  The Plaintiff's function was further diminished by his multiple co-morbid illnesses, and his overall exercise capacity remained poor. (Tr. 424).  Dr. Ochoa determined that the Plaintiff could not perform his past work as a truck driver. (Tr. 424).

On January 10, 2003, Dr. Ochoa completed a physical assessment.  (Tr. 447-448).  Dr. Ochoa indicated that the Plaintiff could sit for eight hours of a workday, stand/walk for one hour, lift up to 10 pounds, and could work up to four hours per day.  (Tr. 447).  The Plaintiff was also restricted from work involving fumes and other pulmonary irritants, moving machinery, wet or humid areas, and outdoor activity. (Tr. 18, 447-448).

On  January 2, 2004, Dr. Sigmund completed a questionnaire form for counsel.  (Tr. 425-426).  Dr. Sigmund stated that the Plaintiff was markedly impaired in fourteen out of nineteen functional catagories related to work activity, and affecting his ability to tolerate stress and to maintain concentration, peristence or pace.  (Tr. 425-426).  The Plaintiff's ability to drive or take public transportation, make judgments, meet work standards, work with a team, and deal with the public was considered markedly impaired.  (Tr. 425-426).  Dr. Sigmund opined that the Plaintiff had

chronic post-traumatic stress disorder with a history of alcohol abuse. (Tr. 426).   The Plaintiff was given a GAF score of 55. (Tr. 425).

On March 22, 2004, Dr. Peter DeRussey, Capt. USAF, completed a statement for counsel. (Tr. 449-450).  Dr. DeRussey listed the Plaintiff's impairments as: diabetes mellitus Type II-insulin requiring, poor control; chronic atrial fibrillation; chronic Coumadin anti-coagulation; history of systolic dysfunction; hypertension; hyperlipidemia; mild chronic renal insufficiency; gastroesphogeal reflux disease; post-traumatic stress disorder, former alcohol abuse; obstructive sleep apnea, with C-PAP; gout; chronic pain; history of polycythemia; non-alcoholic steato hepatitis; and erectile dysfunction. (Tr. 19).  Dr. DeRussey opined that the Plaintiff was incapable of maintaining any form of employment due to his multiple medical conditions.  (Tr. 19, 449-450).  Dr. DeRussey discussed the Plaintiff's occupational restrictions, however, he also admitted that he was not an occupational medicine specialist and the questions on the form were somewhat out of his area of training. (Tr. 19, 450).

A letter written by Jason Bell, a staff orthopedic surgeon for the Department of the Air Force was received by the hearing office on February 24, 2005. (Tr. 456).  Dr. Bell indicated that the Plaintiff had triggering in both thumbs which was improved with steroid injections. (Tr. 456).  The Plaintiff had arthritis in his knees and right hip. (Tr. 19).  The Plaintiff used a three-wheel walker to assist with ambulation. (Tr. 19, 456).  Dr. Bell treated the Plaintiff conservatively as his other medical conditions disqualified him for surgery. (Tr. 19, 456).

On March 10, 2005, Frederick Clare, Capt. USAF, BSC, a cardiologist on staff, examined the Plaintiff as a routine follow-up on a chronic condition. (Tr. 461).  Dr. Clare stated that the Plaintiff had non-ischemic cardiomyopathy complicated by atrial fibrillation. (Tr. 461).  Although the

atrial fibrillation was stable, his functional capacity was limited by a moderate to severe heart dysfunction. (Tr. 461). Dr. Clare opined that the Plaintiff was incapable of returning to his past work as a truck driver. (Tr. 20, 461).

A log referencing glucose levels from April 2001 through February 2005 suggested inconsistent and sometimes poor control of diabetes. (Tr. 463). A sliding scale insulin blood sugar log through May 2005 was also submitted. (Tr. 463).

In January 2004, a Holter monitor showed evidence of atrial fibrillation but no ischemic changes. (Tr. 467). In August 2004, the Plaintiff underwent a stress test that revealed no evidence of ischemia or myocardial infarction. (Tr. 20, 467). Other miscellaneous medical records submitted included x-rays of the Plaintiff's hands from January 2005. (Tr. 2005). The Plaintiff also submitted documentation dated May 13, 2000, of a physician's order for therapeutic phlebotomies. (Tr. 489). The diagnosis was polycythemia. (Tr. 489).

## *Administrative Law Judge's Decision*

Upon consideration of the record, the ALJ found the Plaintiff met the disability insured-status requirements of the Act on his alleged disability onset date and continued to meet them through December 31, 2002, but not after that date. (Tr. 27). The ALJ found that the Plaintiff did not engage in substantial gainful activity after his alleged disability onset date. (Tr. 28). The ALJ determined that the Plaintiff has "severe" impairments consisting of atrial fibrillation, diabetes mellitus, post traumatic stress disorder (PTSD) with a history of alcohol abuse, and anxiety disorder. (Tr. 28). However, the Plaintiff does not have an impairment or a combination of impairments which meets or equals in severity the requirements of an impairment listed in, Appendix 1, Subpart P, Regulations No. 4. (Tr. 28). The ALJ further found that the Plaintiff's subjective allegations lack credibility to

the extent that they purport to describe a condition of "disability" as defined in the Social Security Act and Regulations, for the critical period on or before December 31, 2002. (Tr. 28). The ALJ found that for the period on or before December 31, 2002, the Plaintiff retained the residual functional capacity (RFC) for a limited range of medium work featuring: inside work in a temperature-controlled environment; low stress jobs with no fast paced work, no dealing with the public, and no production quotas; no climbing of ladders or unprotected heights; no job in contact with drugs and alcohol; and no work constantly on his feet. (Tr. 28). The ALJ concluded that the Plaintiff was unable to perform his past relevant work as a school bus driver and tractor trailer truck driver. (Tr. 28). The ALJ noted that the Plaintiff was a high school graduate and transferability of work skills is not an issue in this case (Appendix 2, Subpart P, Regulations No.4). (Tr. 28). The ALJ concluded that Vocational Rules 203.14 and 203.17 of Table No. 3, Appendix 2, Subpart P, Regulations No. 4 direct a conclusion of "not disabled" in the case of individuals who have the vocational profile of the claimant and a maximum sustained work capability for medium work, regardless of whether acquired skills are transferable. (Tr. 28). The ALJ found that although the Plaintiff could not have performed the full range of medium work, competent vocational expert testimony established that jobs remained in significant numbers in the national economy that he could have done on or before December 31, 2002. Examples of 13,000 unskilled light exertion jobs are packaging machine inspector and microfilm mounter. (Tr. 28). Examples of 2,500 unskilled sedentary exertion jobs are lens inserter and toy stuffer. (Tr. 28). Applying the cited vocational rule as a framework for decision making, the ALJ concluded that the Plaintiff was not under a "disability", on or before December 31, 2002, the last date that he had disability insured status; therefore, the Plaintiff's application for a period of disability and disability insurance benefits is denied (20 CFR

202.1520(f)).  (Tr. 28).  Thus, the Plaintiff was found not to be under a "disability" as defined in the

Social Security Act, at any time through the date of the decision.  20 C.F.R. §404.1520(g).

## THE STANDARD OF REVIEW

### A.  Affirmance

The scope of this Court's review is limited to determining whether the ALJ applied the correct

legal standards,  McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the

findings are supported by substantial evidence, Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct.

1420, 28 L. Ed 2d 842 (1971).  In evaluating whether a claimant is disabled, the ALJ must follow the

sequential inquiry described in the regulations[2].  See 20 C.F.R. §§ 404.1520(a), 404.920(a).  The

Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. §

405(g).  Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely

create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable

person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560

---

[2]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability.  The steps are as follows:
   *Step 1*.  Is the claimant engaged in substantial gainful activity?  If the claimant is engaged in such activity, then he or she is not disabled.  If not, then the ALJ must move on to the next question.
   *Step 2*.  Does the claimant suffer from a severe impairment?  If not, then the claimant is not disabled.  If there is a severe impairment, the ALJ moves on to step three.
   *Step 3*.  Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, then the claimant is disabled.  If not, the next question must be resolved.
   *Step 4*.  Can the claimant perform his or her former work?  If the claimant can perform his or her past relevant work, he or she is not disabled.  If not, the ALJ must answer the last question.
   *Step 5*.  Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.  If the claimant cannot engage in other work, then he or she is disabled.  See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

(11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982)); <u>Richardson</u>, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  <u>Edwards v. Sullivan</u>, 937 F.2d 580, 585 n.3 (11th Cir. 1991); <u>Barnes v. Sullivan</u>, 932 F.3d 1356, 1458 (11th Cir. 1991).  The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  <u>Foote</u>, 67 F.3d at 1560; <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court  "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."<u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983).  If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. <u>Lewis v. Callahan</u>, 125 F. 3d 1436, 1440 (11th Cir. 1997).

B.  <u>Reversal and Remand</u>

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. <u>Keeton v. Department of Health and Human Services</u>, 21 F.3d 1064, 1066 (11th Cir. 1994); <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145 (11th Cir. 1991); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the

decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).

To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Jackson, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); Davis, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards). Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. Falcon v. Heckler, 732 F.2d 827, 830 (11th Cir. 1984). (remand was appropriate to allow ALJ to explain the his basis of his decision).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)(finding ALJ error and remanding to consider psychiatric evaluation); Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative

examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. <u>Jackson</u>, 99 F.3d at 1095.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. <u>Jackson</u>, 99 F.3d at 1095. Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. <u>Jackson</u>, 99 F.3d at 1090 - 92; <u>Keeton v. Dept. of Health and Human Serv.</u>, 21 F.3d 1064, 1068 (11th Cir. 1994). With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. <u>Jackson</u>, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[3] <u>Id</u>.

## THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

---

[3]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. <u>Jackson</u>, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. <u>Id</u>. In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. <u>Id</u>.

which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

## **DISCUSSION**

The Plaintiff alleges the ALJ erred in his decision stating: (1) The Plaintiff was not properly informed of his right to counsel; (2) the ALJ failed to give proper weight to the Plaintiff's PTSD Mental Impairment; (3) the ALJ failed to consider all of the Plaintiff's medically determinable impairments in combination or at Step 2 of his evaluation; (4) the ALJ did not give great weight to the Plaintiff's treating physician; (5) the ALJ did not give any consideration to Veterans Administration's (VA) determination that the Plaintiff was 100% disabled; and (6) the ALJ erred in his determination the Plaintiff could perform other work. The Commissioner responds that the ALJ supported his decision with substantial evidence and properly consider all of the Plaintiff's medical evidence prior to his date last insured.

### *(1) Whether the Plaintiff was Properly Informed of His Right to Counsel*

A social security claimant has a statutory right, which may be waived, to be represented by counsel at a hearing before an ALJ. Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right. 42 U.S.C.§ 406; Cowart, 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. Id. at 735-736. However, where an unrepresented claimant has not waived the right to retained counsel, the

ALJ's obligation to develop a full and fair record rises to a special duty. Brown v. Shalala, 44 F.3d 931, 934 - 35 (11th Cir. 1995)(citing Smith v. Schweiker, 677 F.2d 826, 829 (11th Cir. 1982)). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." Cowart, 662 F.2d at 735 (citations omitted). Carrying out this special duty requires a record which shows that the claimant was not prejudiced by lack of Counsel. Brown 44 F.3d at 934.

The Plaintiff asserts that he was denied his right to counsel by the ALJ because he was mentally incompetent to make such a decision. The Plaintiff argues, pursuant to the Hearing Appeals and Litigation Law Manual (HALLEX), the ALJ should have stopped the hearing because the atmosphere became disruptive, the Plaintiff did not understand the process insisting the ALJ hear all of the evidence and that even material that developed after his last date insured should be considered. Thus, he argues that he did not understand the process which demonstrates that the ALJ should have ensured he was represented by counsel. The Plaintiff also argues that he was prejudiced during the hearing because he became upset and the ALJ had to call in a security guard and that if he would have had counsel such an incident would not have taken place. The disturbance apparently started because the Plaintiff insisted the ALJ consider the entire record even materials that developed after his last date insured. The Plaintiff states he lacked understanding of his last date insured problem which establishes his need for counsel. The Plaintiff further demonstrates his alleged confusion by pointing out that he mispronounced Falls Church, Virginia, as Paul's Hills, Virginia throughout the course of the hearing.

The Plaintiff's argument that the ALJ should have stopped the hearing pursuant to HALLEX lacks merit.  While HALLEX provides guidelines for the ALJ's hearing process, HALLEX like all administrative manuals lacks the legal authority to bind the ALJ. *See* <u>Moore v. Apfel</u>, 216 F.3d 864, 868-869 (9th Cir. 2000) (holding that HALLEX lacks legal authority because it is an internal manual without legal force)).  This is because administrative manuals are not vetted through the public hearing process like the Code of Federal Regulations (CFR) which pre-publishes potential regulations to allow the public and interest groups the opportunity to object or comment on the rules before they become effective.

Furthermore, prior to the hearing held on May 11, 2005, the Plaintiff was presented a waiver of counsel form explaining his right to counsel as well as stating that he could waive counsel.  The Plaintiff signed the waiver thereby waiving his right to counsel.  Although the Plaintiff states that he was confused and that his PTSD prevented him from making a competent decision regarding his right to an attorney, the Plaintiff has demonstrated that he is capable of making the decision of whether or not to hire an attorney.  He was represented by counsel in his first hearing held on January 22, 2004, and hired counsel to represent him in this case. These actions are a strong indication to the Court that the Plaintiff understands when and how to hire an attorney to represent his interests.

It is clear from the record, that the ALJ took time to explain the Plaintiff's right to counsel, and the Plaintiff stated he wanted to proceed without representation.  The ALJ noted the Plaintiff was not represented and asked the Plaintiff if he received notice of the hearing which included his right to be represented by counsel. (Tr. 495). The ALJ then explained again to the Plaintiff that he had a right to be represented and even stated that the hearing would be postponed until the Plaintiff could obtain representation if he so desired. (Tr. 496).  The ALJ then explained the nature of the hearing

process and asked if the Plaintiff wanted to postpone the hearing until he could obtain representation. (Tr. 497).  The Plaintiff said he wanted to proceed. (Tr. 497).

The Plaintiff also argues that the ALJ would not let him explain his position nor include information from his prior hearing.  Contrary to the Plaintiff's argument, the ALJ gave the Plaintiff the opportunity to add anything to his prior testimony. (Tr. 501).  Therefore, the Plaintiff's argument that he was denied the right to counsel lacks merit and is respectfully recommended that it should be denied on those grounds.

*(2) Whether the ALJ Failed to Give Proper Weight to the Plaintiff's PTSD Mental Impairment*

Under the Code of Federal Regulations (CFR) the required level of severity to establish Anxiety Related Disorders occurs, "when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied."  The Regulation reads as follows:

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
   a. Motor tension; or
   b. Autonomic hyperactivity; or
   c. Apprehensive expectations; or
   d. Vigilance and scanning; or
2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to aviod the dreaded object, activity, or situtation; or
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress; or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress:

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, and pace; or
4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.06.   The Plaintiff argues that he met 12.06A(5) because of his recurrent and intrusive recollections from the Vietnam War and 12.06B is met because of his marked psychological limitations.  He further argues that the ALJ made factual errors when reviewing the Plaintiff's GAF scores.  The Defendant states that the Plaintiff failed to provide sufficient medical evidence in the record to support a finding of disability under 12.06.

The ALJ cited to the medical record noting that on January 8, 2001, the Plaintiff was diagnosed with PTSD and a GAF of 50, which is consistent with serious limitations. (Tr. 17).  On March 13, 2001, the Plaintiff was evaluated by Dr. Judith Sigmund, a staff psychiatrist, who assessed the Plaintiff with a GAF of 60. (Tr. 17).  The Plaintiff was seen on a follow up visit by Dr. Waters on July 18, 2001, who also assigned a GAF of 60. (Tr. 17).  On January 22, 2002, the Plaintiff was again seen by Dr. Sigmund who lowered the Plaintiff's GAF to 50, noting that the Plaintiff had just been laid off from work. (Tr. 17).  Dr. Sigmund again found the Plaintiff had a GAF of 50 on July 19, 2002, October 25, 2002, and January 31, 2003, however, the ALJ did not address these reports in his decision. (Tr. 434, 436, 438).

On February 22, 2002, Dr. Vickie McCreary, Ph.D., a reviewing psychological consultant of the Bureau of Disability Determination Services, indicated the Plaintiff had no documented episodes of mental decompensation of extended duration and opined that the Plaintiff was moderately

restricted in areas relating maintaining a work schedule, concentrating, and adapting to work changes. (Tr. 18, 346). Dr. McCreary further found the Plaintiff could perform simple household chores, shop and visit clubs. (Tr. 18). In addition to Dr. McCreary's findings, the ALJ reviewed the findings of Dr. Joan Williams, Ph.D., another consultant who affirmed Dr. McCreary's review of the record. (Tr.18).

Based upon the record, the ALJ's decision ignores several GAF scores of 50 that were recorded throughout 2002 prior to the Plaintiff's date last insured. A GAF of 50 is considered severe under the Regulations and would change the nature of the ALJ's ruling. Thus, the matter should be remanded for review by the Commissioner to determine whether or not the Plaintiff's GAF was consistently at 50 or below prior to his last date insured.

### (3) Whether the ALJ Failed to Consider all of the Plaintiff's Medically Determinable Impairments in Combination or at Step 2 of His Evaluation

To determine whether a claimant qualifies for Social Security disability benefits, the ALJ must follow a five step sequential evaluation process set forth by 20 C.F.R. 404.1520. Johnson v. Barnhart, 268 F. Supp.2d 1317, 1324 (11th Cir. 2002). If a determination as to the claimant's disability can be made at one stage, it is not necessary for the ALJ to move on to the next step in the evaluation. McCruter v. Bowen, 791 F.2d 1544, 1546 (11th Cir. 1986). At the second step, the ALJ is to consider the severity of the claimant's impairment, taking into account the duration of the impairment and impairments in combination. Here, the ALJ must decide whether the impairment imposes a limit on the claimant's physical or mental ability to participate in basic work activities. Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997).

Thus, if a claimant has more than one impairment, the Commissioner must review the impairments symptoms, signs, and laboratory findings to determine whether the combination of impairments is  medically equal to any listed impairment. <u>Wilson v. Barhhart</u>, 284 F.3d 1219, 1224 (11th Cir. 2002).  It is the ALJ's duty to make specific and well articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the Plaintiff to be impaired. <u>Walker</u>, 826 F. 2d at 1001.

The Plaintiff states the ALJ erred when he determined the Plaintiff's sleep apnea, hypertension, gout, and arthritis and polycythemia were not severe.  The Plaintiff further argues that the combined effect of all of the above listed in combination with his diabetes, atrial fibrillation, and hyperlipidema created severe impairments that were not considered by the ALJ.

In his decision the ALJ found:

> [t]he evidence establishes that the claimant has "severe" impairments of atrial fibrillation, diabetes mellitus and a diagnosis of post traumatic stress disorder (PTSD) with a history of alcohol abuse and anxiety disorder.  These impairments significantly affect his ability to perform the physical and mental requirements of work activity.
>
> No other "severe" impairments are documented. The claimant has a reported history of obstructive sleep apnea associated with polycythemia, but there is no specific evidence that these impairments have affected his functional abilities.  Evidence submitted in conjunction with the first hearing show that he used a C-PAP machine as a sleep aide, though he did not use it on a regular basis.  There is no evidence that a sleep disorder or excessive red blood cells prevented him form sustaining work activity prior to being laid off or at any time before his disability insured status expired.  Some digestive symptoms, such as reflux were managed conservatively with medication (Exhibit 10E).  High cholesterol was controlled with Zocor (Exhibit 10E).  Dr. Boyce observed that he may have had a possible gouty attack in October 2001, but significant problems due to gout are not documented in 2002 or later.  The staff orthopedic surgeon for the Department of the Air Force provided a recent letter indicating that the patient has some orthopedic problems and now

-22-

requires a walker for ambulation, but as Dr. Boyce noted, there are no objective test findings underlying the reported history of orthopedic impairments (Exhibit 23F). Certainly, for the period through December 31, 2002, there is no evidence from an objective standpoint of arthritis or other orthopedic problems which would have affected the claimant's ability to carry-out basic work-related activities. Nor is there evidence of any functional restrictions due to non-alcohol steato Hepatitis.

The Claimant does not have an impairment or combination of impairments which meets or equals in severity the requirements of an impairment listed, Appendix 1 Subpart P, Regulations No. 4. The Medical expert testified specifically that no listing had been met or equaled on or before December 31, 2002, or through the present.

(Tr. 23). It is sufficient for the Court to determine that the ALJ did indeed consider all of the Plaintiff's medical impairments in combination, where the ALJ states that he considered the impairments in combination. Wilson, 284 F.3d at 1224-1225 (citing Jones v. Dept. of Health and Human Services, 941 F.2d 1529, 1533 (11th Cir. 1991) (holding that the following statement by an ALJ evidenced consideration of the combined effects of a claimant's impairments: "while [the claimant] has severe residuals of an injury to the left heel and multiple surgeries on that area [the claimant does not have] an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4."). Clearly, the ALJ's decision reflects that he reviewed all of the Plaintiff's impairments and considered them in combination along with the medical record and found them to be not severe. After review of the record and the ALJ's decision, the Court concludes that the ALJ made well articulated findings regarding the that Plaintiff's impairments and considered them in combination with all other impairments. Therefore, the Plaintiff's Motion to Remand for the ALJ's failure to consider all of the Plaintiff's impairments in combination should be denied.

*(4) Whether the ALJ Failed to Give Great Weight to the Plaintiff's Treating Physician*

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. 20 C.F.R. § 404.1527 (d); Lewis, 125 F.3d at 1439 - 1441; Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence, supports a contrary finding, or is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, (11th Cir. 1991) (ALJ properly discounted treating Physician's report where the physician was unsure of the accuracy of his findings and statements); Morrison v. Barnhart, 278 F. Supp. 1331, 1334 (M.D. Fla. 2003). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987); Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. 20 C.F.R. § 404.1527 (d)(2); Wilson v. Heckler, 734 F.2d 513, 518

(11th Cir.1984). Furthermore, should the ALJ discount the treating physician's opinion he must clearly articulate the reasons for giving less weight to the opinion, and failure to do so is reversible error. Morrison, 278 F. Supp. at1334.

The ALJ is required to review all of the medical findings and other evidence that supports a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527 (e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner. 20 C.F.R. § 404.1527 (e).

The Plaintiff argues the ALJ rejected the diagnosis of Dr. DeRussy, a treating internist, with the United States Air Force Medical Center, in favor of Dr. Boyce, an independent medical examiner, and Dr. Hill and Dr. Derrow both reviewing physicians from the Bureau of Disability Determination (BDD).  In his decision, the ALJ noted that Dr. DeRussy did not provide his assessment that the Plaintiff could not work at any level until early 2004, which is after the date last insured.  The ALJ further noted the diagnoses were merely a "laundry list" of impairments without a detailed reasoned explanation for the rather extreme functional limitations indicated by Dr. DeRussy. (Tr. 24). Furthermore, DeRussy stated that he was not an "occupational medicine specialist and that he felt that the questions on the assessment form were somewhat out of his area of training. (Tr. 24).

 Disability is determined by the effect an impairment has on the claimant's ability to work, rather than the diagnosis itself. Davis v Barnhart, 153 Fed. Appx. 569, 570 (11th Cir. 2005). Here,

the ALJ found that Dr. DeRussey did not support his findings with a rationale as to how the diagnosed impairments would impact the Plaintiff's ability to work.  Moreover, the ALJ noted Dr. DeRussey himself stated that he was not qualified to make a disability determination.  Thus, the ALJ clearly articulate his reasons for giving less weight to the opinion of Dr. DeRussy and the Motion to Remand on those grounds should be denied.

### (5) Whether the ALJ Erred by not Giving Consideration to Veterans Administration's (VA) Determination the Plaintiff was 100% Disabled

Although a VA disability rating is not binding on the Commissioner, it is evidence that should be given great weight. Kieser v Barnhart, 222 F. Supp. 2d 1298, 1314 n. 4 (M.D. Fla. 2002)(citing Olson v. Schweiker, 663 F.2d 593, 597 n. 4 (5th Cir. 1981); Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir. 1981); Hogard v. Sullivan, 733 F Supp 1465-1470 (M.D. Fla. 1990)).  In this instance, the Plaintiff argues that the ALJ did not consider the VA's 100% disability determination in his decision.

The ALJ acknowledged the VA's disability determination in his decision. (Tr. 20).  However, the VA's determination letter was not issued to the Plaintiff until April 29, 2005, well over two years after the Plaintiff's last date insured.  Therefore, the ALJ was not under an obligation to give great weight to the VA's determination.

### (6) Whether the ALJ Erred in His Determination the Plaintiff Could Perform Other Work

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational

opportunities available to a claimant. Id. at 1558; Allen v.Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. Foote, 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P,Appendix 2, § 200.00 (e); Foote, 67 F.3d at 1559 (citing Heckler v. Campbell, 461 U.S. 458, 103 S.Ct. 1952, 76 L. Ed. 2d 66 (1983) (holding that exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." Walker v. Bowen, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. Foote, 67 F.3d at 1559; MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986) (when nonexertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert). It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. Allen v. Sullivan, 880 F.2d 1200, 1202 (11th Cir. 1989).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. Foote, 67 F.3d at 1559.

In this case, the ALJ heard testimony from a Vocational Expert (VE).  The Plaintiff argues the hypothetical question asked of the VE at the hearing was inadequate because it did not contain the Plaintiff's moderate mental limitations regarding concentration, persistence, and pace and because there was inconsistency between the Dictionary of Occupational Titles (DOT) and the VE's testimony.  The Defendant responds that the hypothetical contained the functional limitations caused by the moderate mental impairments  and not the specific diagnosis and therefore, the question was properly posed.  The Defendant's argument is well taken.  A hypothetical question need only include the functional limitations that are supported by the record and not the actual diagnosed impairment that caused the functional limitation. Jones v Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).

The Plaintiff also argues the ALJ's RFC and the VE's job descriptions and determinations conflict with the DOT's job descriptions.  The Eleventh Circuit has held that when the VE's testimony conflicts with the DOT, the VE's testimony "trumps" the DOT. Jones, 190 F.3d at 1229-1230.  The VE's testimony controls because the VE's task is to determine whether there are jobs in the region which the claimant can perform with his precise disabilities or limitations. Id.  Therefore, an ALJ may rely on the VE's testimony even if it is inconsistent with the DOT. Id.

Here, the ALJ inquired if the jobs enumerated by the VE conflicted with the DOT's job descriptions. (Tr. 518-519).   The VE responded that except for the alternating sitting and standing, his job descriptions did not conflict with the DOT. (Tr. 519).  The VE further stated that his job descriptions were based on his knowledge of the local and national markets (Tr. 519).  Therefore, the ALJ's reliance on the VE's job descriptions  complied with the Eleventh Circuit's standards for giving the VE greater weight over the DOT when the VE's response is inconsistent with the DOT.

Finally, the Plaintiff states the ALJ erred when he relied on the grids in his Finding number

9.  (Tr. 28). The ALJ concluded Vocational Rules 203.14 through 203.17 of Table No. 3 Appendix 2, Subpart P, Regulation No. 4 directed a finding of not disabled for the Plaintiff.  (Tr. 28).  The Plaintiff argues his non-exertional mental impairments preclude a finding of not disabled based upon the grids.  The CFR states that when an individual has both exertional and non-exertional limitations the grids will not be directly applied to the disability determination unless a rule finds you disabled on strength demands; "otherwise the rules provide a framework to guide the decision. 20 C.F.R. § 404.1569(d).  The ALJ called a VE to testify regarding the Plaintiff's limitations and job opportunities for someone with his limitations.  In his findings, the ALJ stated the VE established jobs in the national economy that could be performed by the Plaintiff with his given limitations. Clearly, the ALJ only used the grids as a framework as allowed by the Regulations.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Decision of the Commissioner Regarding the Plaintiff Danny L. Hall should be **REMANDED** to the Commissioner pursuant to 42 U.S.C. § 405(g)(sentence four) for consideration of the following medical evidence:

(1) The Commissioner should review all the medical findings relating to the Plaintiff's GAF score from the alleged onset of disability date on January 7, 2002, though his date last insured on December 31, 2002, to determine if the Medical Evidence Establishes that the Plaintiff's GAF Score was consistently at 50 or below.

(2) The Commissioner should then determine based upon all the evidence whether or not the Plaintiff met the requirements of disability under 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.06.

Failure to file written objections to the proposed findings and recommendations contained in

this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking

the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this __11th__ day of January, 2007.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record